# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| DUBIEL ALVAREZ LEON, | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | No. MO:19-CV-00293-RCG |
| | § | |
| JANNY OLAZABAL RUIZ, | § | |
| *Respondent*. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEFORE THE COURT is Petitioner Dubiel Alvarez Leon's Amended Verified Petition for Return of Child. (Doc. 11). Petitioner seeks return of his six-year old daughter, E.A.O., under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc, No. 99–11, implemented in the United States through the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq*. This case was originally referred to the undersigned through an Order pursuant to 28 U.S.C. § 636 and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. (Doc. 4).

On February 6, 2020, Petitioner Leon consented to the undersigned U.S. Magistrate Judge conducting all proceedings in this case, including trial and final disposition. (Doc. 16). Later, on February 18, 2020, Respondent Janny Olazabal Ruiz consented to the undersigned U.S. Magistrate Judge's jurisdiction for final disposition. (Doc. 18). On February 18, 2020, the District Judge issued an Order granting consent and reassigning the case to the undersigned. (Doc. 19). For the reasons explained below, the Court shall grant Petitioner's request for the return of E.A.O. to Mexico.

# I. FINDINGS OF FACT[1]

On March 2, 2020, the Court held a bench trial. During the trial, the Court heard testimony from Petitioner, Respondent, Respondent's mother Irene Ruiz-Perez, Respondent's friend Yaimeth Leon Roque, and the minor child's teacher Iliana Urrutia. After due consideration of the petition, the answer, testimony, exhibits, briefing, and all arguments made, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

1. Petitioner is a dual citizen of Mexico and Cuba.
2. Respondent is a citizen of Cuba and holds a Mexican passport.
3. Petitioner and Respondent are both originally from Cuba.
4. Petitioner and Respondent met in Cancun, Quintana Roo, Mexico in 2013.
5. Petitioner and Respondent are both professional musicians in Cancun. Petitioner is a manager for musicians who perform primarily at resorts in Cancun, as well as a trumpet player in several bands. Respondent plays the saxophone and the clarinet.
6. Less than a year into their relationship, Respondent became pregnant with E.A.O.
7. E.A.O. was born on May 6, 2014, in Cancun. She is currently five years old.
8. Respondent and Petitioner remained a couple during Respondent's pregnancy and Petitioner was at the hospital during E.A.O.'s birth.
9. Respondent and Petitioner remained in a romantic relationship during the early years of E.A.O.'s life.

---

1. Any finding of fact that is more aptly characterized as a conclusion of law, or any conclusion of law that is more aptly characterized as a finding of fact, is adopted as such.

10. During the first several years of their relationship, Petitioner and Respondent rented an apartment together where they lived during Respondent's pregnancy and after the birth of E.A.O.

11. Respondent and Petitioner took E.A.O. to Disney World in Orlando, Florida, when she was two years old.

12. At some point around the time E.A.O. was two or three, Respondent and Petitioner began having troubles in their relationship. Evidence was introduced that these troubles included physical violence toward Respondent. After several breakups and reunifications, the couple ended their romantic relationship in January 2018.

13. After the couple separated, Respondent and E.A.O. continued to reside in the apartment where Respondent, Petitioner, and E.A.O. had been living.

14. Petitioner moved to an apartment that was approximately fifteen minutes away from the apartment where Respondent and E.A.O. remained. E.A.O. would spend the night with Petitioner at least once per week.

15. Petitioner and Respondent were never married. Additionally, after their breakup, Petitioner and Respondent did not petition the courts in Mexico to determine a formal custody arrangement regarding E.A.O.

16. Petitioner remained involved in E.A.O.'s life after he and Respondent ended their romantic relationship. He paid for E.A.O.'s piano lessons, her private school tuition, and at least occasionally paid a portion of Respondent's rent. Petitioner maintained a close relationship with E.A.O. and had weekly overnight visitations and attended her birthday parties and piano recitals.

17. On July 11, 2019, after spending two days with E.A.O., Petitioner dropped E.A.O. off at Respondent's home.

18. The next day, on July 12, 2019, at approximately 11:30 a.m., Respondent called Petitioner and stated that she had taken E.A.O. but did not disclose her location. Petitioner thought it was likely that Respondent took E.A.O. to either Florida or Texas.

19. Unbeknownst to Petitioner at the time, on July 12, 2019, Respondent and E.A.O. flew from Cancun to Dallas, Texas on tourist visas.

20. The same day, July 12, 2019, Petitioner went to the Cancun Police Department and filed a missing child report. The Cancun Police Department then issued an Amber Alert for E.A.O.

21. Petitioner sent Respondent multiple text messages inquiring about the child's whereabouts and asking when she would be coming back to Cancun.

22. Shortly before flying to the United States, Respondent listed her car for sale online.

23. E.A.O. attended a private school in Cancun called the Lowry School. Petitioner paid the tuition. E.A.O. attended the Lowry School for grade levels K-1 and K-2. She would have begun grade level K-3 in Fall 2019. E.A.O. has friends at the Lowry School.

24. E.A.O. takes piano lessons in Cancun and has had two piano concerts there.

25. Many of E.A.O.'s extended family members live in Cancun, including her paternal grandparents, uncle, and several cousins.

26. E.A.O.'s pediatrician, Dr. Liber Calderon Herrera, lives in Cancun. Dr. Herrera delivered E.A.O. and treats the child occasionally for minor ailments.

27. E.A.O. lived in Mexico her entire life until Respondent brought her to the United States in July 2019.

28. Respondent and E.A.O. are now living with Respondent's boyfriend in Odessa, Texas.

29. E.A.O. is attending Pease Elementary School in Odessa. Accordingly, E.A.O. and Respondent are currently physically located in the Western District of Texas, Midland-Odessa Division.

## II. CONCLUSIONS OF LAW

In light of the foregoing findings, the Court makes the following conclusions of law.

### A. The Hague Convention and ICARA

The Hague Convention is an international treaty to which both the United States and Mexico are signatories. *Sanchez v. R.G.L*, 761 F.3d 495, 500 (5th Cir. 2014). The Hague Convention was adopted in 1980 in response to the emerging problem of international child abductions perpetrated by parents, grandparents, and close family members. *Mozes v. Mozes*, 239 F.3d 1067, 1069–70 (9th Cir. 2001). The Hague Convention sought to remedy the situation where such abductors unilaterally remove a child from his or her habitual residence seeking a country whose courts are friendlier to them for deciding custodial disputes. *Abbott v. Abbott*, 560 U.S. 1, 20 (2010). The drafters of the Hague Convention sought to deter this "unsavory form of forum shopping" in international child-custody disputes. *Kijowaska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006).

The Hague Convention's stated purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other

Contracting States." Hague Convention, art. 1. The United States is a Contracting State and Congress implemented its provisions through the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq*. ICARA establishes procedures for applying the Hague Convention in the courts of the United States, specifically assigning burdens of proof for proving a case for return of a child and for establishing affirmative defenses to return. *See* 42 U.S.C. § 11603. In addition, Congress made clear that the provisions in ICARA "are in addition to and not in lieu of" the Hague Convention. *Id.* at § 11601(b)(2).

Under ICARA, anyone seeking the return of a child allegedly wrongfully removed to or retained in the United States may commence a civil action in any court that has jurisdiction over the action and the place where the child is located. *Id*. § 11603(b). Once an ICARA action is filed, the "court in which [the] action is brought . . . shall decide the case in accordance with the Convention." *Id*. § 11603(d). Though the Hague Convention is silent with regard to burdens and standards of proof, ICARA provides that the petitioner seeking the return of the child has the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." *Id*. § 11603(e)(l)(A). The respondent then has the burden of proving that one of the affirmative defenses listed in Articles 12, 13, or 20 applies. *Id*. § 11603(e)(2). The standard of proof for these defenses is either by a preponderance of the evidence or by clear and convincing evidence. *Id*. § 11603 (e)(2)(A)(B).

ICARA unequivocally limits the scope of United States courts to decide "rights under the Convention and not the merits of any underlying child custody claims." *Id.* at § 11601(b)(4). The purpose of ICARA is to give courts the tools to implement the Convention's primary goals of "restor[ing] the pre-abduction status quo and . . . deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000)

(quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)). "[A]ny debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal [or retention] . . . ." Elisa Pérez–Vera, Explanatory Report ¶ 19, *in* 4 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 430 (1982).

### B. Petitioner's Case

Petitioner requests that E.A.O. be returned to Mexico because Respondent wrongfully removed E.A.O. from Mexico and is wrongfully retaining E.A.O. in the United States in violation of Article 3 of the Hague Convention. In pertinent part, that article provides that:

> The removal or the retention of a child is to be considered wrongful where—
>
> a) it is in breach of rights of custody attributed to a person, . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. To establish a prima facie case for return of E.A.O. to Mexico, Petitioner must show by a preponderance of the evidence that: (1) Mexico was E.A.O.'s "habitual residence" immediately before Respondent's removal and retention of E.A.O.; (2) Petitioner has "rights of custody" under Mexican law, and Respondent's removal and retention is in breach of those rights; and (3) Petitioner was exercising his custody rights at the time of the removal. *See id.*; 42 U.S.C. § 11603(e)(1)(A).

### i. *The Child's Habitual Residence*

Under the Hague Convention, a child wrongfully removed from her country of "habitual residence" typically must be returned to that country. *Monasky v. Taglieri*, __U.S.__, 140 S. Ct. 719, 722 (2020). Accordingly, a threshold determination is which country was the child's habitual residence immediately before the wrongful removal or retention. *See Mozes*, 239 F.3d at 1072 ("'Habitual residence' is the central—often outcome-determinative—concept."). To determine a child's habitual residence, courts are to look at the totality of the circumstances specific to each case. *Monasky*, 140 S. Ct. at 723. First, a child "resides" where she lives. *Id*. at 726 (citing Black's Law Dictionary 1176 (5th ed. 1979)). The residence rises to the level of "habitual" only when "her residence is more than transitory." *Id*. "Habitual implies '[c]ustomary, usual, or the nature of a habit." *Id*. The determination of the child's "habitual residence" is a fact-sensitive inquiry rather than a categorical one. *Id*.

The Supreme Court has recently clarified that while the Federal Courts of Appeals have differed in the exact standards they use to determine a child's habitual residence, they share a common understanding that, "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id*. at 726–27. Additionally, the Supreme Court noted that "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id*. at 727.

Here, Respondent does not contest that E.A.O. was a habitual resident of Mexico at the time of her removal. (*See* Doc. 20). E.A.O. was born in Cancun and resided there until her removal at the age of five years old in July 2019. E.A.O. grew up in Cancun surrounded by her parents and members of her extended family, including her paternal grandparents, uncle, and several cousins. Additionally, E.A.O. attended school in Cancun at the Lowry School for grade

levels K-1 and K-2. She would have begun grade level K-3 had she not been removed to the United States. *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 293 (3d Cir. 2006) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)) ("[A]cademic activities are among 'the most central . . . in a child's life' and therefore highly suggestive of acclimatization."). Further, E.A.O. takes piano lessons in Cancun and has had two piano concerts there. E.A.O. also has several friends at the Lowry School. Taken together, these facts establish that Mexico was E.A.O.'s habitual residence. *See Robert v. Tesson*, 507 F.3d 981, 991 (6th Cir. 2007) ("A child who lives in Mexico, attends Mexican school, and makes Mexican friends for three years builds an attachment to Mexico that would lead any child to call that country 'home.'").

Based on the above discussion, Petitioner has satisfied the threshold requirement for cases arising under the Hague Convention to establish that E.A.O.'s country of habitual residence prior to removal or retention was Mexico. *See Mozes*, 239 F.3d at 1072. Further, Petitioner has proven by a preponderance of the evidence that Respondent removed the child to the United States, which is "somewhere other than the child's habitual residence." *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012).

### ii. *Breach of Petitioner's Rights of Custody*

Because Petitioner has successfully proven that Mexico was the child's country of habitual residence immediately prior to removal, the "question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Id.*; *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004). "The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott*, 560 U.S. at 9 (quoting Hague Convention, art. 5(a)). The term "rights of custody" is to be broadly interpreted so as to bring as

many cases as possible under the purview of the Convention. *Abbott*, 560 U.S. at 19. Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3. Further, breaches of rights of custody are determined by the law of the State in which the children were habitual residents immediately before removal. *Id.*

Here, because there is no formal custody agreement between the parents, the Court will determine whether the rights of custody were breached by applying the laws of Mexico.[2] *Sealed*, 394 F.3d at 343. More specifically, the Court shall look to the laws within the State of Quintana Roo, Mexico, which is where Cancun is located. The State of Quintana Roo, in accordance with the Civil Code for the State of Quintana Roo adheres to the legal doctrine of *patria potestad* (meaning "parental rights"). Quintana Roo Civ. Code, arts. 991, 993. Pursuant to that doctrine, both parents have joint custody rights. *Castro v. Martinez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012); *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 623 (W.D. Tex. 2012). Importantly, rights under *patria potestad* qualify as "rights of custody" under the Hague Convention. *Saldivar*, 879 F. Supp. 2d at 623.

The Court finds, and Respondent does not contest, that Petitioner has established by a preponderance of evidence that he has rights of custody conveyed by *patria potestad* under the laws of the State of Quintana Roo, Mexico. Further, by removing the child from Mexico without Petitioner's consent, Respondent's removal of E.A.O. from Mexico violated Petitioner's rights of custody.

---

2. Petitioner requested that the Court take judicial notice of Mexican law. (Doc. 26). Respondent did not oppose Petitioner's request. Accordingly, the Court took judicial notice of the relevant foreign law of Mexico under the Civil and Criminal Codes for the State of Quintana Roo, as permitted by Article 14 of the Hague Convention. *See* Hague Convention, art. 14 (providing that "[i]n ascertaining whether there has been wrongful removal . . . the judicial . . . authorities of the requested State may take notice directly of the law of, and of judicial and administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.").

### iii. *Exercise of Rights of Custody at the Time of Removal or Retention*

Finally, the Petitioner must show that at the time of removal or retention of the child he was actually exercising his rights of custody or would have been exercising those rights but for the removal or retention. *Larbie*, 690 F.3d at 307; Hague Convention art. 3(b). Courts apply a liberal approach in determining whether a petitioner was actually exercising his rights of custody. *Sealed*, 394 F.3d at 344–45 (citing *Friedrich*, 78 F.3d at 1065–66). "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id*. at 345.

In the instant case, Respondent made no showing that Petitioner abandoned his child. In contrast, Petitioner clearly demonstrated that he was exercising his rights of custody under *patria potestad*. The testimony at trial revealed that E.A.O. had been staying with Petitioner for two days immediately prior to Respondent's removal of the child to the United States. Additionally, Respondent conceded that E.A.O. stayed overnight with Petitioner at least one night per week. Further, Petitioner presented ample evidence that he was thoroughly involved in E.A.O's life, including attending birthday parties, her graduation from grade level K-1, and piano recitals, as well as paying for private school and piano lessons.

The Court finds no abandonment of the child occurred and Petitioner would have been exercising his rights of custody but for the wrongful removal or retention. Therefore, Petitioner has established all three elements necessary to make a prima facie case for return of E.A.O. to Mexico. *See Larbie*, 690 F.3d at 307.

### C. Respondent Olazabal's Case

"When a child under the age of sixteen has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless

certain exceptions apply." *Abbott*, 560 U.S. at 9. The Hague Convention provides five narrow affirmative defenses to the return of a child wrongfully removed from the country of habitual residence. Hague Convention, arts. 12, 13, 13(a), 13(b), 20. As codified by ICARA, two of the affirmative defenses must be proven by clear and convincing evidence: 1) when there exists a grave risk to the child of physical or psychological harm; and 2) when the return would violate the "fundamental principles" relating to the "protection of human rights and fundamental freedoms" of the returning country. Hague Convention, arts. 13(b), 20. The remaining three defenses must be proved by a preponderance of the evidence: 1) when judicial proceedings were commenced one year after the date of removal and the respondent proves that the child is now settled into the new environment; 2) when the child objects to the return and the court finds that the child has reached an age and level of maturity appropriate for the court to take into account the child's view; and 3) when the petitioner seeking return of the child consented to the initial removal or later acquiesced to the removal. Hague Convention, arts. 12, 13, 13(a).

### i. *Respondent's General Denial*

First, the Court notes that Respondent filed an answer in which she made a general denial but did not raise any affirmative defenses. (Doc. 20). Federal Rule of Civil Procedure 8(c)(1) provides: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." As a result, failure to timely plead an affirmative defense may result in waiver and the exclusion of the defense from the case. *LSREF2 Baron, LLC v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014) (citing *Morris v. Homco Int'l, Inc.*, 853 F.3d 337, 342–43 (5th Cir. 1988)). However, "a technical failure to comply with Rule 8(c) is not fatal." *Id.* (quoting *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013)). A defendant does not waive a defense if it is raised with "pragmatically sufficient time"

and does not prejudice the plaintiff in its ability to respond. *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008). A district court has discretion to determine whether the party against whom the defense was raised suffered prejudice or unfair surprise as a result of the delay in asserting the defense. *Levy Gardens*, 706 F.3d at 633.

Here, Respondent did not assert her affirmative defenses until her opening statement at trial. The Court finds that Respondent's last-minute assertion of these affirmative defenses did not give Petitioner "pragmatically sufficient time" to respond. *See Rogers*, 521 F.3d at 386. Further, had the Court allowed the affirmative defenses to be asserted for the first time at trial, Petitioner would have certainly suffered prejudice. *See id*. Accordingly, on this basis alone, the Court finds that Respondent has failed to adequately assert any affirmative defenses to the return of the child. Moreover, as discussed below, after allowing Respondent to put on evidence of her affirmative defenses solely for the purpose of creating a thorough record for a possible appeal, the Court finds that Respondent's affirmative defenses fail on the merits.

### ii. *Now Settled in New Environment*

The affirmative defense asserted most vigorously by Respondent during the trial was the exception whereby a respondent must show by a preponderance of evidence that the child is now settled into the new environment. Hague Convention, art. 12; 42 U.S.C. § 11603(e)(2)(B). However, the exception only applies if the petition for return of a child is commenced in court one year from the date of removal. *Id*.

Respondent fails on the timing requirement for this affirmative defense. Respondent removed E.A.O. from her country of habitual residence, Mexico, on July 12, 2019. The petition for return of the child was originally filed in the Southern District of Florida on December 9,

2019—less than one year after the removal of E.A.O. (*See* Doc. 1-2). Accordingly, even if Respondent had pled this affirmative defense, it fails as a matter of law.

### iii. Consent or Subsequent Acquiescence to Removal

Respondent argued for the first time at trial that Petitioner verbally consented to Respondent removing E.A.O. from Cancun, Mexico to Odessa, Texas. Again, the Court finds Respondent waived this affirmative defense by failing to include it in her answer or to raise it at a reasonable time before trial began. Moreover, the Court finds Respondent was unable to establish this affirmative defense through evidence at the trial.

Return of a child may be successfully opposed if a respondent establishes by a preponderance of the evidence that the person "exercising the custody rights at the time of removal or retention . . . had consented to or subsequently acquiesced in the removal or retention." *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 576 (W.D. Tex. 2013) (citing Hague Convention, art. 13(a); 42 U.S.C. § 11603(e)(2)(B)). "The consent defense involves the petitioner's conduct prior to the contested removal or retention . . . ." *Larbie*, 690 F.3d at 308 (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)); *see also Saldivar*, 879 F. Supp. 2d at 627. When examining a consent defense, a court considers what the petitioner actually agreed to when allowing the child to travel outside of its country of residence and the scope of the petitioner's consent. *Larbie*, 690 F.3d at 309 (citing *Baxter*, 423 F.3d at 371); *see also Munoz v. Ramirez*, No. Mo:12-CV-00082, 2013 WL 563419, at *16 (W.D. Tex. Jan. 25, 2013).

Respondent testified that after at first rejecting Respondent's proposal to take E.A.O. to the United States, Petitioner verbally consented to the removal of E.A.O. from Cancun. Respondent's mother also testified that Petitioner gave verbal consent to the removal of E.A.O. Both Petitioner and her mother testified that Petitioner gave his consent at the end of June 2019.

However, Petitioner presented a large volume of convincing evidence that he never consented to the removal of his daughter. For example, Petitioner testified, and has the police reports to corroborate, that as soon as he discovered E.A.O. had been removed from the country, he went to the Cancun Police Department to file a missing child report. Additionally, he requested the Cancun Police Department issue an Amber Alert for E.A.O. Petitioner also presented text messages from shortly after E.A.O.'s removal wherein he questioned where the child was and when she was coming home. Moreover, the Court finds it particularly telling that Petitioner originally filed this action in the Southern District of Florida, which shows he was unaware of Respondent and E.A.O.'s exact location. All of the evidence taken together clearly leads to the conclusion that Petitioner never agreed to E.A.O.'s removal to Odessa, Texas and he consistently asked for the return of the child after her removal. Accordingly, Petitioner did not consent to the removal of E.A.O. or acquiesce after the fact. Accordingly, this affirmative defense fails on the merits.

### iv. *Grave Risk of Physical or Psychological Harm*

Respondent also argued for the first time at trial that E.A.O. would be exposed to a grave risk of harm if she were to be returned to Petitioner in Mexico. A respondent who opposes the return of a child and asserts a "grave risk" affirmative defense bears the burden of establishing by clear and convincing evidence "that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A); Hague Convention, art. 13(b). Even when a respondent establishes the grave risk exception, "a federal court has 'and should use when appropriate' the discretion to return a child to his or her place of habitual residence 'if return would further the aims of the convention." *England*, 234 F.3d at 271–72 (quoting *Friedrich*, 78 F.3d at 1067)). In

support of her grave risk exception, Respondent and Respondent's mother provided testimony that Petitioner had been violent with Respondent on at least one occasion. There was conflicting testimony from Respondent regarding whether Petitioner was physically violent towards her on two separate occasions. There is no evidence currently before the Court that Petitioner has ever been physically or psychologically abusive towards E.A.O.

A grave risk of harm to the child can be established when return of the child to the country of habitual residence puts the child in "immediate danger prior to the resolution" of the underlying custody dispute. *Friedrich*, 78 F.3d at 1069. Here, as discussed previously, Respondent waived the grave risk defense by failing to plead it. However, based on the evidence presented at trial, the Court finds that Respondent has failed to establish by clear and convincing evidence that there is a grave risk of harm to the child. While the allegations regarding Petitioner's violence towards Respondent are serious, Respondent provided no evidence that *the child*, E.A.O., would be put at any risk upon her return. For these reasons, Respondent's grave risk of harm defense fails.

### D. Attorney Fees and Costs

Petitioner has requested attorney fees and costs, including transportation costs related to the return of the child as required by 22 U.S.C. § 9007. Petitioner has not, to date, submitted proof of costs for transportation, expenses, or legal fees. In a case arising under the Hague Convention, ICARA requires that "[a]ny court ordering the return of a child pursuant to an action brought under [§] 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster homes or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly

inappropriate. 42 U.S.C. § 11607(b)(3). It is the Respondent's burden to show that an award of attorney fees, expenses, and costs would be "clearly inappropriate." *Saldivar*, 879 F. Supp. 2d at 632 (citing *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004)). Respondent has not yet shown that the award of attorney fees and costs would be clearly inappropriate.

### III.    CONCLUSION

Based on the aforementioned, this Court finds that E.A.O.'s habitual residence is Mexico and that she was wrongfully removed to the United States in violation of the Hague Convention. Accordingly, Petitioner Dubiel Alvarez Leon's Amended Verified Petition for Return of Child is **GRANTED**. (Doc. 11).

Petitioner is hereby **AWARDED** physical custody of E.A.O. for the purpose of returning E.A.O. to her country of habitual residence, Mexico. Respondent Janny Olazabal Ruiz **SHALL SURRENDER** E.A.O. to the custody and possession of Petitioner within **five (5) days** of this Order.

E.A.O.'s passport is hereby **RELEASED** to Petitioner Dubiel Alvarez Leon to effectuate the child's return to Mexico. Respondent Janny Olazabal Ruiz may also retrieve her own passport. The parties are hereby instructed to contact the Clerk of Court to make arraignments to retrieve the passports pursuant to this Order.

If Respondent does not return E.A.O. to Petitioner within **five (5) days** of this Order, Petitioner is **ORDERED** to file a Motion to Enforce Judgment and Application for Clerk to Issue Writ of Attachment in which Petitioner shall detail how E.A.O. shall be returned. Failure of Respondent to surrender possession of E.A.O. to Petitioner could require the Court to direct the United States Marshal Service to take physical custody of E.A.O. and will result in serious sanctions, including but not limited to contempt of court.

Petitioner **SHALL** file a notice with the Clerk of Court immediately upon E.A.O.'s return to Petitioner, indicating that Respondent has fully complied with the return.

Absent leave of this Court, Respondent **SHALL NOT** remove, **NOR SHALL** she **ALLOW** anyone else to remove, E.A.O. from the Western District of Texas, Midland-Odessa Division, pending E.A.O.'s return to Petitioner.

It is further **ORDERED** that Respondent pay all necessary expenses and attorney fees pursuant to 42 U.S.C. § 11607(b)(3). However, the award of attorney fees and costs under 42 U.S.C. § 11607(b)(3) is contingent on Petitioner filing, within **fourteen (14) days** of this Order, an itemization of all costs requested and a brief detailing of the services rendered. Respondent shall have **seven (7) days** from the date of service of Petitioner's itemization and brief to file a response, asserting why the requested award is "clearly inappropriate." Based on the aforementioned, this Court will determine the appropriate monetary award of attorney fees and costs.

It is finally **ORDERED** that the Court retains jurisdiction over this case to permit any modification or enforcement of this Order.

The Court will issue a final judgment at the appropriate time.

It is so **ORDERED**.

SIGNED this 13th day of March, 2020.

RONALD C. GRIFFIN
UNITED STATES MAGISTRATE JUDGE